NO. 07-04-0246-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

MARCH 8, 2006
_____

ADAM GRIMALDO,

Appellant

v.

THE STATE OF TEXAS,

Appellee
_____

FROM THE 137TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2003-404,575; HON. CECIL G. PURYEAR, PRESIDING
_____

***Opinion***
_____

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Appellant, Adam Grimaldo, appeals his conviction for possessing a controlled substance with intent to deliver in a drug free zone. Two issues are before us. The first deals with the trial court's denial of his motion to suppress. The second concerns the legal and factual insufficiency of the evidence supporting the conviction. We reverse the judgment of the trial court.

***Background***

On January 16, 2002, Investigator Tony Marez of the Lubbock Police Department arranged to purchase cocaine through a confidential informant. Prior to meeting with Jesus Villalobos, the seller, Marez searched the informant and equipped him with a listening device. Marez and the informant then met Villalobos at an E-Z Mart. Villalobos was accompanied by a man named Jaime Jalomo. The informant left in a vehicle with Villalobos and Jalomo and drove to a house on 37th Street. At the abode, Jalomo entered same, stayed for approximately ten minutes, and then returned to the vehicle. The three men then drove back to where Marez was waiting. The informant entered Marez' vehicle and delivered to him a plastic bag containing a white powder. Believing it to be a controlled substance, Marez signaled for Villalobos and Jalomo to be arrested. On the heels of this arrest another was taking place at the house on 37th Street.

Apparently, various officers had followed the informant, Jalomo and Villalobos from the E-Z Mart to the 37th Street address to witness the transaction. When it was completed, some stayed and continued their surveillance of the residence. During this time, one officer saw appellant exit the house, approach the street, look up and down it, cross to the other side, walk towards another house, and return several minutes later. Though two different officers were observing the home, only one saw appellant cross the street and return, however. This was so because the other had driven around the corner to don a bulletproof vest. The officer stated that he donned the vest because he was near "the target location." And, upon questioning by defense counsel, the same officer conceded that he "already" knew that he was going to enter the house whereat the transaction occurred before being told about appellant's venture in crossing the street. Another officer

2

confirmed that the police decided to "breach" the house once it was discovered that the drugs in question were sold from it.

So, when the signal was given to arrest Villalobos and Jalomo at the E-Z Mart, at least five officers at the 37th Street locale approached the door of the home, knocked twice, encountered no response, and forcibly entered the abode. Of the officers asked if they had probable cause to believe that evidence of a crime existed in the house, each replied in the affirmative. Several also testified that the circumstances they had observed would have supported the issuance of a search warrant. Yet, only one thought it advisable to obtain such a warrant before conducting the raid. No warrant was obtained, however. Instead, the group of officers decided to

> actually go ahead and secure the house . . . knock on the door and attempt to make contact with somebody . . . then . . . once we were either allowed in the house or if we felt it necessary to force entry into [it], to secure it, to prevent the destruction of evidence or the escape of any other suspects inside . . . in order that we may either obtain consent to search the house or obtain a search warrant for the house.

So, with guns drawn, they "breached" the door, yelled out that they were the police, and ordered everyone to "get down." A sweep of the house, which an officer described as "small," then occurred. While not finding any contraband during the sweep, they nevertheless secured the residence. This was done with handcuffs and requiring that the occupants lay belly down on the floor. Those within the residence included appellant, several other adults, a teenager and two children under five years of age.[1] Appellant was

---

[1]The record does not disclose whether the two children were also handcuffed and made to lie on the floor.

3

found in a hallway by the rear bedroom. The officers also ordered him to lie on the floor face down. Then, he was handcuffed.

Immediately upon securing the house, one or more officers took appellant into the rear bedroom. There he purportedly consented to a search of the home after being informed of his *Miranda* rights and right to refuse consent to the search. According to one or more officers, appellant was cooperative and began inculpating himself before being Mirandized and without solicitation. When that occurred, the officers purportedly told him to be quiet until he was Mirandized. At about this same time, one of the officers present was directed to obtain a written consent to search form for appellant's signature. Appellant signed the document. And, in addition to executing the form, he also assisted the officers in their search of the house and discovery of controlled substances.

According to the record, the time that lapsed between the instant Villalobos and Jalomo left the 37th Street house, returned to the E-Z Mart, were arrested, and the officers breached the door of the house and secured its occupants approximated six to eight minutes. The time between the initial breach of the house and the directive to obtain a consent form that appellant could sign approximated one or two minutes.

### Issue One - Motion to Suppress

Appellant first argues that the trial court erred in refusing to grant his motion to suppress. The motion allegedly was viable because the officers engaged in an unlawful entry and search of the abode. Furthermore, both purportedly were unlawful because 1) the officers had neither a warrant or exigent circumstances to breach the door and conduct a search and 2) the consent to search given by appellant was either involuntary or not sufficiently attenuated from the unlawful entry. We sustain the issue.

4

We review the trial court's ruling on a motion to suppress under the standard announced in *Johnson v. State,* 68 S.W.3d 644 (Tex. Crim. App. 2002) and *Guzman v. State,* 955 S.W.2d 85 (Tex. Crim. App. 1997). It requires us to give almost total deference to the trial court's findings of historical fact and review *de novo* the application of law to those facts. *Johnson v. State,* 68 S.W.3d at 652-53.

Next, the burden lies with the State to prove the legality of a warrantless search. *Amores v. State,* 816 S.W.2d 407, 413 (Tex. Crim. App. 1991). Furthermore, when the legality of the search is dependent upon the consent of the detainee, the State's obligation becomes that of proving the validity of the consent by clear and convincing evidence. *Johnson v. State*, 68 S.W.3d at 652 n.30; *Brick v. State*, 738 S.W.2d 676, 681 (Tex. Crim. App. 1987).

Finally, that the detainee may have knowingly and voluntarily given consent to search does not *ipso facto* permit use of the evidence discovered. One other obstacle must be overcome, and it deals with the attenuation, if any, between the illegal seizure and the ensuing consent. That is, in addition to establishing the validity of the detainee's consent, the State must also prove by clear and convincing evidence that the taint inherent in the illegal search or seizure had dissipated by the time the consent was given. *Brick v. State,* 738 S.W.2d at 678*; State v. Bagby*, 119 S.W.3d 446, 452 (Tex. App.–Tyler 2003, no pet.). And, in determining whether the taint had sufficiently dissipated, we consider such factors as whether 1) temporal proximity between the unlawful seizure and consent given was close, 2) the unlawful seizure brought about police observation of the particular object for which they sought consent to search, 3) the illegal seizure was flagrant police

5

misconduct, 4) the consent was volunteered rather than requested by the officers, 5) the detainee was made fully aware of the fact that he could decline to consent to the search, and 6) the purpose underlying the seizure was to obtain the consent. *Id.* With this said, we turn to the matter at hand.

*Initial Entry*

As previously mentioned, the officers had no warrant justifying their entry into the house. Thus, the entry was unlawful unless there existed probable cause (to believe instruments or evidence of a crime would be discovered therein) coupled with exigent circumstances rendering the procurance of a search warrant impracticable.[2] *Estrada v. State,* 154 S.W.3d 604, 608 (Tex. Crim. App. 2005). Here, the record illustrated that the officers' entry into appellant's home was warrantless. Thus, it was incumbent upon the State to prove that the officers acted with probable cause and under exigent circumstances. Assuming *arguendo* that probable cause existed, we address the matter of exigent circumstances.

According to the officers, they believed that drugs and drug money lay within the house, the drugs and money were subject to easy destruction, and they themselves were endangered. Moreover, the latter two observations were founded upon one officer purportedly seeing appellant leave the house, proceed to the adjacent street, look up and down the road, walk or trot across it, proceed towards another house, and return moments

_____

[2]Exigent circumstances justifying a warrantless entry into a home include 1) rendering aid or assistance to persons whom the officers reasonably believe are in need of assistance, 2) preventing the destruction of evidence or contraband, 3) protecting the officers from persons whom they reasonably believe to be present, armed, and dangerous, *Estrada v. State,* 154 S.W.3d 604, 608 n.12 (Tex. Crim. App. 2005), and 4) an increased likelihood of apprehending a suspect. *Barocio v. State*, 158 S.W.3d 498, 500 (Tex. Crim. App. 2005); *McNairy v. State*, 835 S.W.2d 101, 107 (Tex. Crim. App. 1991).

6

later.[3] According to the officer who saw this activity, it appeared suspicious and of the ilk undertaken by a lookout attempting to spy police presence. Yet, when asked upon what he based his supposition, the officer simply referred to his training and experience in dealing with drugs and drug traffickers. How the act of a drug trafficker crossing a street after looking both ways differed from the same act undertaken by any man, woman, or child taught to look for oncoming traffic before crossing a street went undeveloped. How and why that action created more suspicion when undertaken by a drug trafficker than by any other adult or child also suffered the same malady. Whether appellant stood by the curb for an extended period of time, turned his head slowly as if to peer into cars or secluded places, or undertook like actions were omitted from the record. This absence of additional descriptive facts is fatal for an officer's opinions influencing his decision to act must be objectively reasonable. And, the absence of such facts supporting those opinions prevents us from assessing whether they met that standard. *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005) (wherein the officer opined that the suspect violated a traffic regulation by "'following too close'" to another vehicle). More importantly, an officer's statement that he simply relied on his experience and training to arrive at the conclusion does not fill the void. *Id.* at 494. Given this, we cannot but say that the officer's opinion about appellant acting suspiciously when crossing the street was conclusory and, therefore, without evidentiary value.

Nor can we say that any other reason given by the officers as basis for immediately raiding the house were of any greater weight. It may well be, as suggested by the officers,

---

[3]Whether appellant again looked up and down the road when returning to the 37th Street house went unmentioned.

that had appellant seen them when crossing the street he could have destroyed the contraband and money, attempted to flee, or secured weapons to defend himself against a raid. Yet, neither were we cited to nor did we find evidence remotely suggesting that those watching the house were in a location permitting easy discovery or that in looking up and down the street, appellant or anyone else spied their presence. This void is also telling since, logically, an individual must be aware of an officer's presence before it can be said that knowledge of the officer's presence somehow influenced the individual's actions. *See McNairy v. State*, 835 S.W.2d at 107 (noting that relevant to the belief that evidence may be destroyed is, among other things, the existence of information indicating that the possessor of narcotics is aware that the police are on his trail). In short, no facts appear of record rendering the beliefs uttered by the police objectively reasonable. Indeed, the actual circumstances confronting the officers was best summed up when one witness testified that ". . . we just didn't know what was going on with [the evidence] at that time." Again, inferences, opinions, and conclusions stimulating an officer to act must be reasonably objective and supported by fact as opposed to speculation or surmise. And, those facts were missing from the record here.

Consequently, we hold that the record fails to contain evidence from which the presence of exigent circumstances could be reasonably inferred. So, the officers' entry into the 37th Street house was illegal. Having concluded this, we must now conduct a *Brick* analysis to decide whether appellant's purported consent to search the home was free of taint arising from the illegal raid. For purposes of this undertaking, we assume that appellant did consent. Thus, our focus lies on the matter of attenuation, the pertinent

8

indicia cited in *Brick*, and the efforts of the State to prove attenuation by clear and convincing evidence.

Of the six *Brick* indicia, all but one weighs against the State. For instance, appellant's execution of the written consent form came within minutes of the breach of the home by the officers. That is hardly sufficient time for the occurrence of intervening acts permitting cool reflection by appellant. Second, that the entry was flagrant police misconduct is illustrated not only by the want of exigent circumstances but also by the testimony of several of the officers. Again, one opined that if the decision where left to him, he would have first obtained a warrant before entering the house. Another said that the decision to gain entry into the house either through consent or by force was made before appellant undertook the suspicious act of crossing the street after looking both ways. Another testified that the decision was made to enter once it was determined that the substance obtained from the house was contraband. This evidence evinces that the officers were intent on immediately entering the home irrespective of whether they had the time and ability to obtain a warrant.

Third, though some evidence indicated that appellant volunteered information to the officers before they Mirandized him, the record does not indicate that the information included authorization to search the house. Rather, the record illustrates that the officers obtained a written consent form and gave it to him for his perusal and execution upon the heels of securing the premises and its occupants.

Fourth, as to the matter of whether the officers' purpose in entering the home was to secure consent to search, we again turn to the testimony that 1) they were going to gain entry through consent or by force, 2) an officer was directed to secure the requisite form

9

within minutes of his entry into the house, and 3) the consent form was signed within minutes of appellant being handcuffed and taken to the rear bedroom. Those circumstances reasonably support the inference that the officers entered the house to obtain authorization to search it.

Fifth, it can hardly be denied that the unlawful entry into and sweep of appellant's home coupled with the unlawful detention of those in it brought about police observation of the object for which they sought consent to search. Again, they had no warrant to enter or search the house. Nor was the contraband they sought within plain view. Similarly, it was not until after the door was breached and the occupants were handcuffed and placed on the ground that appellant uttered comments about the location of the drugs and drug money. And, all this happened within a time span of mere minutes. As one officer testified, the general plan was to act quickly and deny others time to prepare.

Finally, while evidence illustrates that appellant was told of his right to refuse consent, one can only wonder if the utterance evinced a legitimate choice. By that time, the officers had already entered the home illegally, ran through the house yelling and with guns drawn, and seized those present, including appellant, without legal justification. Moreover, when asked what would have happened if appellant refused to give his consent, an officer testified that they would have obtained a search warrant. Though the witness did not say whether appellant and the other occupants would have been freed from the unlawful restraint or whether the officers would have exited the premises while the warrant was obtained, nothing of record suggests that they would have.

In short, it does not matter whether appellant's consent was voluntary. The *Brick* indicia weigh against a finding that sufficient attenuation occurred between the unlawful

seizure and consent afforded by appellant. Thus, the trial court erred in overruling appellant's motion to suppress appellant's statements made during and the evidence found as a result of the unlawful seizure.[4]

### *Issue Two – Sufficiency of the Evidence*

In his second and last issue, appellant argued that the evidence was legally and factually insufficient to support the finding that he possessed cocaine either as a party or as a principle. Had the evidence obtained as a result of the raid been admissible, it would have been more than legally and factually sufficient enough to support his conviction. Thus, the issue is overruled.

Accordingly, we reverse the judgment of the trial court and remand the cause.


Brian Quinn
Chief Justice


Publish.

---

[4]Though the State believes the opinion in *Reasor v. State*, 12 S.W.3d 813 (Tex. Crim. App. 2000) to be controlling, we find it readily distinguishable. First, in *Reasor* nothing was said of *Brick* and its holding. Indeed, the court seemed to focus more on the voluntariness of consent than the issue of attenuation. And, while it did say that the consent was sufficiently attenuated from the illegal seizure because the officers had not found any contraband during the protective sweep, *id.* at 818, we hesitate to read *Reasor* as eviscerating the applicability of all the other *Brick* factors via that one conclusory statement. Second, it can be said that the officers in *Reasor* at least had reasonable suspicion to legitimately detain Reasor in his driveway. Here, however, the officers had no lawful basis to initially come into contact with appellant in the manner they did. Third, the circumstances in *Reasor* indicate that more than a few minutes were involved in the interaction between the officers and Reasor. Indeed, there the officers had sufficient time to make inquiry of Reasor and determine that his companion was not involved. That suggests that the officers were not in the rush exhibited by the police at bar. And, while the officers here did opt to release some of the occupants of the house, nothing suggests that this occurred before they raided the home, secured those present, and had appellant sign the consent form. Fourth, while the officers "repeatedly" informed Reasor of his right to remain silent and Mirandized him before conducting the illegal sweep, the police at bar did not do so until after the illegal raid. Nor does the record suggest that the warnings were "repeatedly" uttered. Simply put, the purported "reasonableness of the arresting officers" in *Reasor*, *id.*, as well as the passage of time permitting minds to cool and reflect are not apparent here.