**The STATE of Texas, Appellant,**

**v.**

**Lavetta Renee WILLIAMS, Appellee.**

**Nos. 14–09–00353–CR, 14–09–00354–CR, 14–09–00355–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

May 6, 2010.

Jeri Yenne, Sparks P. Veasey, III, Angleton, for appellant.

James Joseph Hanley, Houston, for appellee.

Panel consists of Justices YATES, BROWN, and BOYCE.

## MAJORITY OPINION

JEFFREY V. BROWN, Justice.

Lavetta Renee Williams was arrested on three counts of possession of a controlled substance, penalty group three less than twenty-eight grams. The arrest occurred after police discovered she was concealing prescription drugs in her bra. She filed a motion to suppress the evidence obtained in the search. After reviewing all the evidence during the hearing on the motion to suppress, the trial court granted Williams's motion. We affirm.

### I

At about 4:30 a.m. on July 29, 2008, Angleton police officer Tony Duncan pulled over a vehicle with a defective tail lamp. Four people were in the vehicle including Lavetta Renee Williams, who was seated in the rear seat behind the passenger. Officer Duncan testified that he had pulled over the same vehicle earlier that night in the same part of town. He stated that only Joseph Newman, the driver, was in the vehicle at the time of the first incident. During the first incident, Officer Duncan noticed a bottle of pills in the center console of the vehicle, but he let Newman "go with a warning."

When Officer Duncan pulled over the vehicle the second time, he noted that the bottle of pills was missing. Officer Duncan also testified that when Newman pulled over, the front-seat passenger exited the vehicle and ran into a nearby convenience store. Officer Duncan arrested Newman for possession of a controlled substance after he discovered numerous prescription pills in his pocket during a pat-down search.

Officer Duncan testified that after he made the arrest, Newman told him that Williams had a steak knife, and she was threatening to stab the other passengers. During Newman's arrest, Williams had stayed seated in the back seat of the vehicle, she did not make any sudden movements or gestures, and she never attempted to escape. Officer Duncan testified that he was familiar with Williams because she had been the subject of several narcotics complaints and had a reputation for having a violent temper.

After all the occupants were out of the vehicle, at least two other officers, including one female officer, arrived on the scene to assist Officer Duncan. Officer Duncan testified that he did not want to conduct a pat-down of Williams because she was a female. He stated that he asked Williams to "kind of reach underneath [her bra] and just pull it out a little bit and kind of shake it a little bit ... and maneuver it." Because Williams was relatively well-endowed—"more than average"—Officer Duncan was concerned she may have concealed the steak knife in her bra. Williams "refused, cried, and said she did not want to pull out her bra." Officer Duncan again asked Williams to shake out her bra. After the second request, Williams complied and numerous pills fell out of her bra. Officer Duncan arrested Williams for possession of a controlled substance. After she was arrested, the female officer on the scene conducted a pat-down of Williams.

Williams filed a motion to suppress the evidence of drugs in her bra, and after reviewing all the evidence at the hearing on the motion to suppress, the trial court granted the motion. The State's appeal followed.

## II

The State contends that the trial court erred in granting Williams's motion to suppress the prescription pills that fell out of Williams's bra after she maneuvered it. Specifically, the State argues that the search was reasonable under the circumstances, Williams consented to the search, and Officer Duncan's request was less intrusive than a pat-down. Williams contends that the search exceeded the permissible scope of a pat-down, she did not voluntarily consent to the search, and Officer Duncan's request was more intrusive than a pat-down.

We generally review a trial court's decision to grant or deny a motion to suppress using an abuse-of-discretion standard. *Swain v. State*, 181 S.W.3d 359, 365 (Tex.Crim.App.2005). During the suppression hearing, the trial court is the exclusive trier of fact and judge of the witnesses' credibility. *State v. Ross*, 32 S.W.3d 853, 855 (Tex.Crim.App.2000); *Mason v. State*, 116 S.W.3d 248, 256 (Tex. App.-Houston [14th Dist.] 2003, pet. ref'd). An appellate court affords almost total deference to the trial court's determination of historical facts supported by the record, especially when the trial court's findings are based on an evaluation of credibility and demeanor. *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex.Crim.App.2002) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997)). We afford the same amount of deference to a trial court's ruling on "application of law and facts questions" or "mixed questions of law and fact" if the resolution turns on evaluating credibility and demeanor. *Johnson*, 68 S.W.3d at 652; *Guzman*, 955 S.W.2d at 89. We review de novo, however, those questions of mixed law and fact not turning on credibility or demeanor. *Johnson*, 68 S.W.3d at 653 (citing *Guzman*, 955 S.W.2d at 89). If the trial court's ruling is reasonably supported by the record and is correct on any theory of law applicable to the case, the reviewing court must sustain it upon review. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App.1996); *Flores v. State*, 172 S.W.3d 742, 748 (Tex. App.-Houston [14th Dist.] 2005, no pet.). This is true even if the trial court states the wrong reason for the correct decision. *State v. Ross*, 32 S.W.3d 853, 855–56 (Tex. Crim.App.2000).

### A

The State argues that Officer Duncan did not violate Williams's Fourth Amendment rights against unlawful searches and seizures because the officer's actions were reasonable under the circumstances. Officer Duncan testified that he had a reasonable basis to believe Williams possessed a steak knife, and he was concerned for his safety. Based on this information, he requested that Williams pull her bra away from her body and maneuver it in lieu of conducting a pat-down. The State would have this court conclude that based on these facts Officer Duncan's actions are permissible under *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny. We decline to do so.

The Fourth Amendment protects individuals from unlawful searches and seizures. U.S. Const. amend. IV. Both the U.S. Supreme Court and the Court of Criminal Appeals have held that a traffic stop is considered a Fourth Amendment seizure. *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *see Davis v. State*, 947 S.W.2d 240, 243–45 (Tex.Crim.App.1997). Because traffic stops are analogous to investigative detentions, they are analyzed under the two-prong test in *Terry*. *Green v. State*,

256 S.W.3d 456, 461 (Tex.App.-Waco 2008, no pet.) (citing *Berkemer*, 468 U.S. at 439, 104 S.Ct. 3138). During a valid traffic stop, the driver and all of his passengers are considered seized within the meaning of the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 257–58, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). To be a valid traffic stop, the stop must be reasonable. *Davis*, 947 S.W.2d at 244; *see* U.S. Const. amend. IV. A detention is reasonable if: (1) the police officer's actions were justified at the stop's inception; and (2) the stop was reasonably related in scope to the circumstances that initially justified the stop. *Terry*, 392 U.S. at 19–20, 88 S.Ct. 1868; *Kothe v. State*, 152 S.W.3d 54, 63 (Tex.Crim.App.2004). Once a police officer makes a valid traffic stop and detains the suspect, the officer may further detain the suspect if he develops reasonable suspicion that another offense is being committed. *Goudeau v. State*, 209 S.W.3d 713, 719 (Tex.App.-Houston [14th Dist.] 2006, no pet.); *see Davis*, 947 S.W.2d at 244.[1]

▮▮▮ The State correctly argues that there may be reasonable circumstances that allow officers to search a suspect for weapons, but courts have not allowed an overly broad or unlimited search during a pat-down. *See Balentine v. State*, 71 S.W.3d 763, 770 (Tex.Crim.App. 2002). A valid investigative detention can give a police officer the ability to pat-down or frisk the suspect for weapons. *Baldwin v. State*, 278 S.W.3d 367, 371 (Tex.Crim. App.2009). Police officers may conduct a limited search for weapons of the suspect's outer clothing, even in the absence of probable cause, when an officer reasonably believes that the suspect is armed and dangerous. *Balentine*, 71 S.W.3d at 769; *Carmouche v. State*, 10 S.W.3d 323, 329 (Tex.Crim.App.2000); *see Terry*, 392 U.S. at 27, 88 S.Ct. 1868.[2] Courts have emphasized, however, that the protective search is not related to seizing evidence or other non-weapon contraband. *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence...."); *Balentine*, 71 S.W.3d at 769. An officer is allowed to search a suspect for weapons only if he can point to specific and articulable facts which reasonably led him to conclude that the suspect might possess a weapon. *Balentine*, 71 S.W.3d at 769; *Carmouche*, 10 S.W.3d at 329. The officer's belief that the suspect has a weapon must be "objectively reasonable in light of the circumstances." *Carmouche*, 10 S.W.3d at 330. In other words, "[t]he officer need not be absolutely certain that an individual is armed; the issue is whether a reasonably prudent person would justifiably believe that he or others were in danger." *Balentine*, 71 S.W.3d at 769.[3] Courts have stressed, however, that the permissible scope of a protective search for weapons is extremely

---

1. " 'Reasonable suspicion' exists if the officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person had engaged or (soon will be) engaging in criminal activity." *Garcia v. State*, 43 S.W.3d 527, 530 (Tex.Crim. App.2001) (citing *Woods v. State*, 956 S.W.2d 33, 38 (Tex.Crim.App.1997)).

2. "A pat-down search is substantially less intrusive than a standard search requiring probable cause." *O'Hara v. State*, 27 S.W.3d 548, 550 (Tex.Crim.App.2000).

3. *See, e.g., Sturchio v. State*, 136 S.W.3d 21, 24 (Tex.App.-San Antonio 2002, no pet.) (explaining that an officer was able to conduct a weapon pat-down of a suspect because she knew from experience that prostitutes frequently carried small weapons like scissors or fingernail files).

narrow. *Spillman v. State*, 824 S.W.2d 806, 809 (Tex.App.-Austin 1992, pet. ref'd) (discussing Supreme Court cases recognizing a balance between privacy interests of individuals and officer safety).

But courts have allowed officers to conduct more intrusive searches of suspects under certain situations. *See Adams*, 407 U.S. at 145, 147–48, 92 S.Ct. 1921; *Minnesota v. Dickerson*, 508 U.S. 366, 375–76, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 11.48 (2d ed.), 11.50 (2d ed. & Supp. 2009–2010). In *Adams v. Williams*, a police officer approached the suspect's vehicle and saw a gun in the suspect's waistband. 407 U.S. at 144–45, 92 S.Ct. 1921. Instead of pulling the suspect out of the vehicle and conducting a pat-down, the officer reached into the vehicle and extracted the gun. *Id.* at 145, 92 S.Ct. 1921. Although the officer's actions exceeded the scope of a pat-down, the Court held the officer's actions were proper because of the surrounding circumstances. *Id.* at 149, 407 U.S. 143. First, the officer had received a tip that the suspect was carrying a gun in his waistband, so there was specific information that the suspect had a weapon and where it was concealed. *Id.* at 146, 92 S.Ct. 1921. Second, the suspect refused to exit the vehicle. *Id.* at 148, 92 S.Ct. 1921. Finally, because the suspect was in a vehicle in a seated position, an attempt to pat him down would have been dangerous and difficult. *See id.;* Dix & Dawson, § 11.48. The combination of the above facts justified why the officer did not need to perform a traditional pat-down.

In *Minnesota v. Dickerson*, the Supreme Court expanded *Terry* to allow officers to permissibly retrieve contraband that they immediately detected during a pat-down. 508 U.S. at 375–76, 113 S.Ct. 2130. When performing a pat-down, if an officer "feels an object whose contour or mass makes its identity immediately apparent there had been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." *Id.* at 375, 113 S.Ct. 2130; *Carmouche*, 10 S.W.3d at 330. Therefore, the officer's subsequent seizure of the object is valid. *Carmouche*, 10 S.W.3d at 330.

As in *Adams*, Officer Duncan obtained information that Williams may have a weapon, and he was understandably concerned for his safety. But unlike *Adams*, Officer Duncan did not refrain from conducting a pat-down because doing so would have been dangerous or difficult, or because Williams refused to exit the car, or because he had been told the weapon was hidden in her bra. Officer Duncan testified that Williams complied with his request to exit the car, and that he did not conduct a pat-down on Williams because she was a female.

Officer Duncan's reluctance to perform a pat-down on a female provides insufficient justification for broadening the scope of the search, especially when a female officer was on the scene and immediately available to conduct the pat-down in his place. Having the female officer perform the pat-down would neither compromise officer safety nor expose Williams to an overly broad search. Besides, we are aware of no authority prohibiting a male officer from patting down a female suspect, nor has the State pointed to any such authority.

In its brief, the State maintains that our decision in *Johnson v. State* demonstrates that Officer Duncan's actions were proper. *See* No. C14-92-00216-CR, 1992 WL 289330, at *1 (Tex.App.-Houston [14th Dist.] Oct. 15, 1992, no pet.) (mem. op., not designated for publication). In *Johnson*, police officers tried to execute a search warrant on a residence and the appellant

fled. *Id.* When the appellant was apprehended, a female officer asked her to reach under her blouse and shake out her bra. *Id.* The appellant complied with the request, and drug paraphernalia fell out of her bra. *Id.* The issue in *Johnson*, however, was not whether the request was permissible, but whether the officer had reasonable, articulable facts that the appellant possessed a weapon. *Id.* at 648–51. Because the scope of the search was not an issue in *Johnson*, it is distinguishable and the State's reliance on it is misplaced.[4]

The State also compares aspects of Williams's case to the Court of Criminal Appeals's conclusions in *State v. Sheppard* and *Carmouche v. State*. The State argues that when a weapon may be concealed on the suspect and an officer is reasonably concerned with his safety, then an officer can conduct a search. In both *Sheppard* and *Carmouche*, the court decided that an officer could lawfully search the suspect for weapons. *State v. Sheppard*, 271 S.W.3d 281, 288 (Tex.Crim.App.2008); *Carmouche*, 10 S.W.3d at 330–31. But the facts in *Carmouche* and *Sheppard* initially involved a police pat-down or frisk of the outer clothing of a suspect, not a search of the suspect's undergarments. *Sheppard*, 271 S.W.3d at 284; *Carmouche*, 10 S.W.3d at 327. Only after the initial frisk or pat-down did the court allow an officer to try to extract a weapon from the suspect. *See Sheppard*, 271 S.W.3d at 288, 292; *Carmouche*, 10 S.W.3d at 330–31.

Here, the trial court concluded that Officer Duncan would have been justified in conducting a pat-down of Williams. The distinction between *Sheppard* and *Carmouche* and the case at bar is that Officer Duncan did not conduct a *Terry* pat-down before employing more intrusive means of searching Williams. If a pat-down had been conducted, and if a weapon or other contraband had been detected as a result, then either Officer Duncan or the female officer could have attempted to extract the item or could have conducted a more intrusive search.

Additionally, although Officer Duncan had been told that Williams had a knife, he was not told, nor was there any other indication, that Williams had hidden the knife in her bra. Furthermore, there is nothing to show that a pat-down would have been dangerous or ineffective. Officer Duncan stated that he did not want to pat-down a female, but the State has not cited any authority to show that he was therefore justified in conducting a more intrusive search. And the "more than average" size of Williams's bust, as Officer Duncan described it, did not constitute a reasonable circumstance that would allow officers to conduct an overly broad search. *See Balentine*, 71 S.W.3d at 770. Because the State has not presented us with a situation justifying a search exceeding the scope of a pat-down, we cannot say the trial court abused its discretion in suppressing the evidence.

### B

 The State asserts that Williams voluntarily consented to Officer Duncan's request to maneuver her bra. Courts have held that consent to search is one of the specific and "well-established exceptions to the constitutional requirements of both a warrant and probable

---

4. In addition to its flawed comparison with *Johnson*, the State improperly tried to link evidence of flight to Williams. In its brief, the State argues that courts consider evidence of flight to decide if an officer had reasonable suspicion to detain and search a suspect. The record clearly indicates that it was the front-seat passenger that exited the vehicle after it stopped. Williams remained in the back seat of the vehicle while Officer Duncan arrested Newman, and she never tried to escape.

cause." *Carmouche*, 10 S.W.3d at 331; *see Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Flores v. State*, 172 S.W.3d 742, 749 (Tex. App.-Houston [14th Dist.] 2005, no pet.). The consent must be voluntary. *Carmouche*, 10 S.W.3d at 331; *Flores*, 172 S.W.3d at 749. The validity of consent is a question of fact that is determined from all of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Carmouche*, 10 S.W.3d at 331. When an individual gives consent to search, the consent must "not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth*, 412 U.S. at 228, 93 S.Ct. 2041; *see also Allridge v. State*, 850 S.W.2d 471, 493 (Tex. Crim.App.1991) ("The consent must be shown to be positive and unequivocal, and there must not be any duress or coercion."). "Although the federal constitution only requires the State to prove the voluntariness of the consent by a preponderance of the evidence, the Texas Constitution requires the State to show by clear and convincing evidence that the consent was freely given." *Carmouche*, 10 S.W.3d at 331; *see Flores*, 172 S.W.3d at 749.

■■■■ Courts consider many factors in deciding if a suspect's consent was given voluntarily. *Flores*, 172 S.W.3d at 749–50. These factors include: (1) whether the consenting person was in custody; (2) whether the suspect was arrested at gunpoint; (3) whether the suspect had the option of refusing consent; (4) the constitutional advice given to the suspect; (5) the length of detention; (6) the repetitiveness of the questioning; and (7) the use of physical punishment. *Id.* We also consider the suspect's age, intelligence, and education. *Flores*, 172 S.W.3d at 750. Therefore, the examination of the totality of the circumstances should include all the circumstances before the search, the sus-

pect's reaction to pressure, and any other factor deemed relevant. *Reasor v. State*, 12 S.W.3d 813, 818 (Tex.Crim.App.2000).

■■■■ When a suspect's consent may be questionable, courts consider the above factors in deciding if consent was voluntary. *Reasor*, 12 S.W.3d at 818–19 (discussing that although the defendant was arrested at gunpoint, his consent to search his house was voluntary because he had received his statutory warnings two times, he signed a consent form, and he was repeatedly warned he had the right to remain silent); *Carmouche*, 10 S.W.3d at 332–33 (holding the appellant's consent was not voluntary because four police officers backed him up against a car when they asked him to consent, he was never told he had the right to refuse consent, and officers had already searched the appellant during a *Terry* frisk); *Flores*, 172 S.W.3d at 750–52 (stating the court decided, after reviewing the totality of the circumstances, that the appellant's consent was not voluntary because the appellant was never given his *Miranda* warnings, the appellant twice declined the officer's request to search, the appellant was handcuffed and under arrest when he consented, the officers used coercive tactics to push the appellant to consent to the search, and the officers threatened to vacate the appellant's mother and young son from the house during the search if the appellant did not consent). The number of officers present at the scene is significant in determining the validity of consent. *Manzi v. State*, 56 S.W.3d 710, 717 (Tex. App.-Houston [14th Dist.] 2001), *aff'd*, 88 S.W.3d 240 (Tex.Crim.App.2002). "The Court of Criminal Appeals has been critical of consent given in the face of numbers of armed officers." *Id.* (citing *Lowery v. State*, 499 S.W.2d 160, 168 (Tex.Crim.App. 1973)). Courts have considered the fact that the appellant initially refused to give

consent; however, courts have also recognized the ability for a person to change his mind and later consent. *Manzi*, 56 S.W.3d at 718. Finally, courts have tried to balance the fact that a suspect was not informed he could refuse to consent with the premise that officers have no affirmative obligation to inform the suspect he may refuse to consent. *Carmouche*, 10 S.W.3d at 332–33; *Manzi*, 56 S.W.3d at 718–19.

The State cites to *McAllister v. State*, *Champenois v. State*, and *Collins v. State* for the proposition that because Williams complied with Officer Duncan's request, the trial court should not have suppressed the evidence of drugs. *See McAllister v. State*, 34 S.W.3d 346, 350–351 (Tex.App.-Texarkana 2000, pet. ref'd); *Champenois v. State*, 874 S.W.2d 254, 258 (Tex.App.-Houston [1st Dist.] 1994, pet. ref'd); *Collins v. State*, No. 14–06–00889–CR, 2007 WL 3287879, at *4 (Tex.App.-Houston [14th Dist.] Nov. 6, 2007, no pet.) (mem. op., not designated for publication). The State urges that it is permissible for officers to ask a suspect to remove an item of clothing, such as a shoe, if a suspect voluntarily consents. *See Champenois*, 874 S.W.2d at 258; *Collins*, 2007 WL 3287879, at *4. Although in *Collins* and *Champenois* the courts held that officers permissibly asked a suspect to remove a shoe, the circumstances surrounding those cases are factually different from the case at bar. *Champenois*, 874 S.W.2d at 258; *Collins*, 2007 WL 3287879, at *4. In *Collins* and *Champenois*, the suspects never argued their consent was involuntary. *Champenois*, 874 S.W.2d at 258 ("Officer Stone asked [appellant] if he would consent to be searched. Appellant replied, 'Sure, I consent to search' … [appellant] also admitted that he gave his assent."); *Collins*, 2007 WL 3287879, at *4 ("Appellant neither asserts nor cites evidence suggesting that his removal of his shoes was anything other than consensual. . . ."). Additionally,

the appellant in *McAllister* also voluntarily consented. *McAllister*, 34 S.W.3d at 351. The police officer offered to give McAllister a ride home after the officer had arrested the driver of the vehicle in which McAllister was a passenger. *Id.* The officer explained he needed to conduct a patdown of McAllister before he entered the officer's vehicle. *Id.* The court concluded that McAllister indicated his consent by throwing his hands in the air. *Id.*

Here, Williams physically and verbally indicated she did not want to comply with Officer Duncan's request. In the findings of fact, the trial judge found that "Williams refused, began crying, and said she did not want to pull out her bra." This finding demonstrates that Williams did not simply and readily consent like the suspects in *Collins*, *Champenois*, and *McAllister*.

Before Williams was searched, the trial court found she remained seated in the back of the vehicle, she did not make any sudden movements, and she did not attempt to escape. Before Officer Duncan even asked Williams to step out of the vehicle, the front-seat passenger had fled the vehicle, the other back-seat passenger was pulled out of the vehicle and patted down, and the driver was searched and arrested for possession of prescription pills. Williams witnessed all these events from the back seat of the vehicle. The trial court found that at least two other officers arrived on the scene to assist Officer Duncan, including one female officer. The officers arrived on the scene before Officer Duncan requested that Williams pull out her bra and maneuver it. There is neither a finding of fact nor testimony from Officer Duncan to show that he informed Williams she had the right to refuse to acquiesce to his request, or that he read Williams her constitutional rights. After Officer Duncan asked Williams to maneuver her bra, she "refused, began

crying, and said she did not want to pull out her bra." Officer Duncan asked Williams a second time before she complied with his request. Although Williams was not under arrest, held at gunpoint, or threatened with physical punishment, the State has not provided clear and convincing evidence that Williams consented voluntarily. *Carmouche*, 10 S.W.3d at 331. After examining the totality of the circumstances leading up to the search and the suspect's reaction to the pressure of the situation, we conclude that Williams did not voluntarily consent to Officer Duncan's request.

## C

The State contends that even if we hold "an issue of search did not exist" or Williams's consent was not voluntary, Officer Duncan's request for Williams to maneuver her bra is still permissible because the request was less intrusive than a patdown search. The State cites *Bell v. Wolfish* and *McGee v. State* to support its argument that law enforcement's interest can outweigh the intrusiveness of the search. *See Bell v. Wolfish*, 441 U.S. 520, 560, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *McGee v. State*, 105 S.W.3d 609, 616 (Tex. Crim.App.2003). In *Bell*, a prison guard was searching an inmate for contraband, and the search involved an intrusive visual body-cavity search. 441 U.S. at 558, 99 S.Ct. 1861. In *McGee*, an officer performed a search pursuant to a lawful arrest at a fire station, and the search was also an intrusive visual body-cavity search. 105 S.W.3d at 615. Although these cases discuss degrees of intrusion, the searches are body-cavity searches, which are significantly different from a *Terry* pat-down. Thus, the cases the State cites do not support its position. Accordingly, we overrule the State's issue on appeal and affirm the trial court's ruling.

\* \* \*

For the foregoing reasons, we affirm the trial court's judgment.

YATES, J., concurring.

LESLIE B. YATES, Justice, concurring.

I agree with the majority's conclusion that the trial court properly granted Williams's motion to suppress. I write separately to provide a different analysis for the ultimate conclusion that the trial court was correct.

Because Officer Duncan searched Williams without a warrant, it was the State's burden to prove that the search was reasonable under the circumstances. *See Ford v. State*, 158 S.W.3d 488, 492 (Tex.Crim.App.2005). When, as here, an officer has a reasonable suspicion that a suspect may be armed and dangerous, he is entitled to conduct a limited search for weapons to ensure the safety of the officer and those around. *See Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Carmouche v. State*, 10 S.W.3d 323, 329 (Tex.Crim.App.2000). This is an extremely narrow exception, and the search must "be strictly circumscribed by the exigencies which justify its initiation." *Terry*, 392 U.S. at 26, 88 S.Ct. 1868; *see also Balentine v. State*, 71 S.W.3d 763, 769–70 (Tex.Crim.App.2002); *Lippert v. State*, 664 S.W.2d 712, 718 (Tex.Crim.App. 1984) (citing *Ybarra v. Illinois*, 444 U.S. 85, 93–94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)). The touchstone of any *Terry* analysis is reasonableness, and we must balance each case individually to determine whether the circumstances giving rise to the need to search justified the level of personal intrusion. *See Michigan v. Long*, 463 U.S. 1032, 1046, 1050–51, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *Carmouche*, 10 S.W.3d at 329–30.

In this case, the trial court concluded that Officer Duncan exceeded the scope of a pat down for weapons. Although Terry involved a pat down of outer clothing and is the typical way of conducting a weapon search, such searches can be conducted in another manner if the circumstances justify. For example, if an officer has received specific information about the location of a possible weapon, either through a tip or from viewing a suspicious bulge, courts have allowed the officer to forgo a pat down and take actions such as (1) requesting a suspect to lift his shirt,[1] (2) reaching into a suspect's boots or waistband,[2] and (3) requiring a suspect to open his mouth.[3] Courts have also allowed weapon searches and seizures without a pat down first if the officer demonstrated that a pat down would be ineffective or dangerous, such as (1) if a suspect refused to get out of a car[4] or (2) if the pat down would not have revealed sufficient information to allay the officer's suspicion because the suspect's clothing was overly bulky or the suspect's boots were too hard.[5] In all of these cases, the circumstances justified something other than a traditional pat down. *Cf. Sibron v. New York*, 392 U.S. 40, 65, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (holding that reaching into pockets without first conducting a pat down search was improper under the circumstances).

The difficulty in making such an assessment of the search in this case is the state of the record. The written record is unclear or silent regarding several critical items, including:

- Why did Officer Duncan think a pat down would have been ineffective? Officer Duncan testified that he was concerned that Williams might have had something concealed in her bra that might not have readily been felt during a typical pat down. He stated that Williams's bust size was "above average," but that does not explain why he thought she could have hidden a steak knife in her bra or that a pat down would not have revealed some indication of the knife, which could have justified additional searching.[6]

---

**1.** *See United States v. Baker*, 78 F.3d 135, 136, 138 (4th Cir.1996) (officer ordered suspect to lift shirt after observing triangular-shaped bulge near suspect's waistband); *United States v. Hill*, 545 F.2d 1191, 1192–93 (9th Cir.1976) (officer ordered suspect to lift shirt when officer saw a bulge at waistband and officer had report of bank robber in area who had displayed gun in waistband to bank tellers).

**2.** *See Adams v. Williams*, 407 U.S. 143, 146–48, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (officer who reached into waistband had just been given information that suspect had gun there); *Garcia v. State*, 649 S.W.2d 697, 697–98 (Tex.App.-San Antonio 1983, no pet.) (officer removed gun from boot after informant told officer suspect had gun in boot and officer observed a bulge there).

**3.** *See Dixon v. State*, 187 S.W.3d 767, 769–70 (Tex.App.-Amarillo 2006, no pet.) (officer required suspect to open mouth after officer saw suspect raise hands and then refused to

face officer and spoke in mumbles through clenched teeth).

**4.** *See Adams*, 407 U.S. at 146–48, 92 S.Ct. 1921 (officer removed gun from suspect's waistband after receiving tip that gun was there and suspect refused to get out of car to be patted down).

**5.** *See Ex Parte Alabama*, 678 So.2d 1049, 1051 (Ala.1996) (officer reached into jacket pockets when extremely bulky jacket made pat down ineffective); *State v. Vasquez*, 167 Ariz. 352, 807 P.2d 520, 524 (1991) (in banc) (officer reached into hard leather boots rather than patting them down because pat down would not have been effective); *People v. Sorenson*, 196 Ill.2d 425, 256 Ill.Dec. 836, 752 N.E.2d 1078, 1089 (2001) (pat down of steel-toed hiking boots would not have revealed weapon).

**6.** *See Balentine*, 71 S.W.3d at 769–70; *Lippert*, 664 S.W.2d at 721; *McAllister v. State*, 34 S.W.3d 346, 352–53 (Tex.App.-Texarkana 2000, pet. ref'd).

Although Officer Duncan may have been hesitant to pat down a woman's bra area, he did not explain why a pat down would have been ineffective in this case had he done so, and the State has cited no authority to show that it is inherently unreasonable for a male officer to pat down a female suspect.

- Did Officer Duncan require Williams to reach under her dress to lift her bra, or did she lift her bra by grabbing it through her dress? The record merely states that she had to "reach underneath," but it is unclear if she was reaching underneath her dress also or just her bra, and the parties disagree in their briefs regarding the interpretation of the record on this point.
- How much, if any, were Williams's breasts or other body parts exposed during the search? The record is completely silent on this point. Though the State asserts in its brief that the search occurred in a place not observable by the public, it is undisputed that it occurred in a convenience store parking lot, and Officer Duncan testified in the hearing that Williams was not later subjected to a full strip search because "we're right there in view of the public."

The opinions and conclusions motivating police conduct must be objectively reasonable and supported by facts articulated in the record. *See Torres v. State*, 182 S.W.3d 899, 902–03 (Tex.Crim.App.2005); *Ford*, 158 S.W.3d at 492–94; *Grimaldo v.*

*State*, 223 S.W.3d 429, 433–34 (Tex.App.-Amarillo 2006, no pet.). When a record is undeveloped, either because the evidence is conclusory or because it is silent on critical matters, a court cannot conduct a proper assessment of the reasonableness of the officer's actions. *See Ford*, 158 S.W.3d at 493; *Paulea v. State*, 278 S.W.3d 861, 865–66 (Tex.App.-Houston [14th Dist.] 2009, pet. ref'd); *Grimaldo*, 223 S.W.3d at 433–34. Based on this record, it is impossible to balance the degree of invasion against the officer's need to search.[7] Because it was the State's burden to show the search was reasonable and this record does not have the information needed to assess the reasonableness of the situation, the State has not met its burden. *See Torres*, 182 S.W.3d at 902; *Ford*, 158 S.W.3d at 494. For these reasons, I conclude the trial court did not err in granting Williams's motion to suppress, and therefore I respectfully concur.

---

7. The State argues that because the trial court found a pat down would be justified and the search here was less intrusive than a pat down, the search should be upheld on that basis. Williams argues that Officer Duncan would not have been allowed to lift and shake her bra himself and that him requiring her to do so does not render the search unintrusive. All weapon searches of a person involve some

level of personal intrusion. *See Terry*, 392 U.S. at 16–17, 88 S.Ct. 1868. Our task is to balance all the circumstances for reasonableness in each case. *See Long*, 463 U.S. at 1046, 1050–51, 103 S.Ct. 3469; *Carmouche*, 10 S.W.3d at 329–30. A comparison to a traditional pat down would be but one factor in our analysis, not an independent ground to justify the search.