**Jonathan MANZI, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–99–01308–CR.**

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 16, 2001.

712

Clay S. Conrad, Houston, TX, for appellants.

Dan McCrory, Houston, TX, for appellees.

Panel consists of Justices ANDERSON, HUDSON, and SEYMORE.

## OPINION

HUDSON, Justice.

Appellant, Jonathan Manzi, was charged by indictment with possession of at least 400 grams of methamphetamine with intent to deliver. The charge was enhanced with a previous federal conviction for possession of sixty-one kilograms of marijuana with intent to deliver. The State abandoned the enhancement paragraph, and appellant entered a plea of guilty. Pursuant to the terms of a plea bargain agreement, the court assessed appellant's punishment at confinement in the state penitentiary for a term of twenty-five years and a fine of one dollar. In a single point of error, appellant contends the trial court erred in overruling his pretrial motion to suppress. Appellant asserts the methamphetamine seized by the police was the fruit of an unlawful entry and search. We affirm.

The circumstances surrounding the search and seizure were established by affidavit as authorized by the Code of Criminal Procedure. TEX.CODE CRIM. PROC. ANN. art. 28.01, § 1(6) (Vernon 1989). Appellant offered his own affidavit; the State offered the affidavits of several narcotics officers. In regard to the preliminary events leading up to the search, the parties seem to be in general agreement. On May 19, 1999, Officer Fred Wood of the Houston Police Department's Narcotics Division was contacted by a confidential informant he knew to be credible because he had previously provided information that resulted in the filing of at least three other drug cases. The informant told Wood that a man he knew only as John had offered to sell him up to five ounces of methamphetamine for $900/ounce. The informant gave a detailed description of the man, including the fact he "had a distinctly abnormal top lip, resembling a cleft lip." The man also told the informant that he was wanted by the "Feds" and needed to quickly raise enough cash to leave the country. The informant told Officer Wood the man was in room 340 of a specified hotel on the Southwest Freeway.

Officer Wood confirmed that the phone number provided by the informant was the number for the hotel previously told him by the informant. Wood went to the hotel and spoke with the Senior General Manager who told Wood: (1) that the occupant in room 340 was named Jonathan Manzi; (2) that Manzi had been in the room for three days; (3) that he had paid cash for each day of his stay at the hotel; (4) that he had been making and receiving many telephone calls; (5) that he had lots of visitors; and (6) that he had a blond woman staying in the room who was "really out of it." Wood and two other officers then moved into room 344 where they could maintain surveillance of appellant's room. While maintaining surveillance, Wood received a telephone call from the informant who said he had just spoken with appellant. The informant told Wood that appellant was preparing to leave the hotel. Wood then stepped out of the room and walked to the north end of the hallway. While he was observing the area, appellant walked out of room 340 and proceeded down the hallway toward Wood. The two remaining narcotics officers in room 344 then stepped out into the hallway behind appellant and identified themselves as police officers. Appellant

immediately began running down the hallway toward Wood. Officer Wood produced his badge and yelled, "Police officer, stop." When it became clear to Wood that appellant was not going to stop and that he intended to force his way past him, Wood drew his firearm. Upon seeing the weapon, appellant immediately hit the floor, sliding feet first toward the officer. Appellant came to a stop a few feet from Wood and was quickly handcuffed.

After his arrest, appellant was taken to room 344. According to Wood, appellant was informed of his rights. Appellant told the officers he had served time in a federal penitentiary for smuggling marijuana and that the Immigration and Naturalization Service was attempting to deport him. He also told police that his girlfriend was asleep in room 340. Officer Wood told appellant he had reliable information that he was in possession of a large amount of methamphetamine. Appellant told Wood that he had a pipe for smoking marijuana, but that he had consumed all of his supply. Wood then asked appellant if he would sign a consent to search his hotel room.

At this point in the proceedings the affidavits of appellant and the police diverge. Appellant says he first refused to give consent to search. However, he relented when the police threatened to arrest his girlfriend:

> Officer Wood threatened that if I didn't consent he'd search anyway and arrest my girlfriend. I finally agreed to let them search my room, if they agreed not to arrest my girlfriend, who was asleep inside the room. Officer Wood agreed that if I showed them where any drugs in the room were then Jennifer would not be arrested.

> I agreed to let the officers search the room, but I refused to sign anything because I felt I was being forced and didn't have any way to refuse under the circumstances. I was frightened, and

the officers made it clear that it didn't really matter what I said. They had the key to the room, they had me in handcuffs and I was in a room where nobody knew where I was. They kept intimidating me with their guns while I was locked in there with them.

> They then took me to my room, where Jennifer was still asleep in bed, naked. She was sleeping really hard and couldn't wake up, so they pulled the sheets off her and made a lot of jokes about her. They ordered me to show where the drugs were. At first, I claimed all I had in the room was the clip I told them about earlier. They said the deal was off unless I gave them some drugs, so I showed the officers where the drugs were hidden.

In contrast, all three officers said appellant, not the police, attempted to work out a deal to keep his girlfriend from being arrested. When asked for consent to search, appellant reportedly said, "Look, if there is dope in the room, and I help you, and my girlfriend doesn't know anything about the drugs, will you agree not to arrest her?" Officer Wood told appellant he would not arrest the woman if there was no reason to do so. Appellant then asked Wood to put the promise in writing. Wood replied that he would not agree to anything, either orally or in writing, until he knew the exact circumstances inside the room. Appellant, in turn, said he would not sign a written consent to search unless Wood made a written promise not to arrest his girlfriend. Wood then told appellant that if he "personally showed officers where [the methamphetamine] was concealed, thereby showing officers [that he] alone knew about the drugs, [the police] would have no choice but not to charge his girlfriend with possessing them." With this assurance, appellant told police he would show them where the methamphetamine was hidden if they would first let him talk to his girlfriend. Wood agreed.

The officers entered appellant's hotel room. Appellant's girlfriend was awakened with great difficulty. Appellant explained to the woman that police officers were with him, but everything was going to be alright. Without making a response, the woman fell back into a very deep sleep. Appellant then directed the police to a pipe. Wood told appellant he was not interested in the pipe, but rather in the methamphetamine appellant had told him about. Appellant then directed Wood to several locations in the room where methamphetamine was hidden. The police also observed a digital scale on a dressing table that appeared to have methamphetamine residue on it. Appellant's girlfriend was apparently arrested and transported to the police station, but never charged. According to the officers, no "deal" was ever made with appellant; he was never told the deal was off if he did not show them the drugs; and appellant was never intimidated with a firearm while discussing whether appellant would give consent to search.

After reviewing the affidavits and hearing the arguments of counsel, the trial judge denied appellant's motion to suppress. Appellant's request for findings of fact was denied.

### Standard of Review

■■■ Ordinarily, the trial judge is the exclusive judge of the credibility of witnesses and weight to be given testimony at a hearing on a motion to suppress; the judge may believe or disbelieve any, part or all of any witness's testimony. *Gibbs v. State*, 819 S.W.2d 821, 830 (Tex.Crim.App. 1991). When distinguishing between the truth and a lie, the trial judge must often be guided by a subjective, intuitive perception that arises from the tenor of a witness's voice or his uncomfortable demeanor. Often a judge is aided in this task by the attorneys who, through their cross-examination, expose some prevarication of the witness. Sometimes the mere physical presence of the accused can make it more difficult for a witness to utter or conceal a false accusation. It is for this reason that appellate courts must "afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997).

■■■ Here, however, the trial court determined the facts from affidavits submitted by the parties. In cases where the parties are in substantial agreement on the underlying facts, the use of affidavits may be an efficient means of presenting legal issues to a court for determination prior to trial. Where critical facts are in dispute, however, such disputes are poorly resolved by the use of affidavits.[1] The procedure permits no confrontation, no opportunity to observe, no testing by cross-examination, no inadvertent slips of the tongue, no retraction or recantation of testimony, no clarification of terms, etc.[2] Thus, in the

---

1. The legislature did not restrict the use of affidavits only to instances where the parties are in agreement on the underlying historical facts. The statute provides that a court may determine the merits of a motion to suppress "upon *opposing* affidavits." Tex.Code Crim. Proc. Ann. art. 28.01, § 1(6) (Vernon 1989) (emphasis added).

2. Any disposition of a motion to suppress on the basis of opposing affidavits can only be considered a *preliminary* ruling because the Confrontation Clause provides a defendant the right physically to face those who testify against him and the right to conduct cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); *Delaware v. Fensterer*, 474 U.S. 15, 18–19, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). Accordingly, a hearing by affidavit does not satisfy the Sixth Amendment. *Meza v. State*,

case before us, the trial court was in no better position to determine the historical facts than we are.

Nevertheless, the Court of Criminal Appeals has held that determining the truth of an affidavit "is a question of historical fact to be determined by the trial court." *Kober v. State*, 988 S.W.2d 230, 233 (Tex. Crim.App.1999); *see also Cardenas v. State*, 960 S.W.2d 941, 945 (Tex.App.— Texarkana 1998, pet. ref'd) (holding a trial court may utilize affidavit in motion for new trial hearing to resolve factual disputes). How facts are determined from the face of opposing affidavits, we cannot tell. However, in light of *Kober*'s pronouncement and the traditional inability of an appellate court to find facts, we will utilize the ordinary standard of review. In other words, we will give almost total deference to the trial court's implied determination of historical facts and review de novo the court's application of the law of search and seizure to those facts. *State v. Ross*, 32 S.W.3d 853, 856 (Tex.Crim.App. 2000).

### NATURE OF CONSENT

The Fourth Amendment to the United States Constitution guarantees to every individual the right to be free from unreasonable searches and seizures. A search made after voluntary consent is not unreasonable. *Kolb v. State*, 532 S.W.2d 87 (Tex.Crim.App.1976). In determining whether a defendant's consent was voluntary, the State is required to prove the voluntariness of consent by clear and convincing evidence. *State v. Ibarra*, 953 S.W.2d 242, 243 (Tex.Crim.App.1997). When resolving this issue, the trial court must look at the totality of the circum-

stances surrounding the statement of consent in order to determine whether that consent was given voluntarily. *Lackey v. State*, 638 S.W.2d 439, 447 (Tex.Crim.App. 1982).

Here, appellant contends there are numerous factors tending to show his consent was coerced, i.e.: (1) appellant was under arrest; (2) appellant was confronted by three police officers; (3) the police displayed their weapons; (4) appellant was in handcuffs; (5) appellant was moved by police from a public setting to their private base of operations; (6) the police were in possession of appellant's room key and thus already had the means of effecting entry; (7) police told appellant they wanted the methamphetamine; (8) the police made repeated requests for a consent to search; (9) the police never told appellant he had a right to withhold his consent; (10) the police coerced appellant's consent by promising not to arrest his girlfriend; and (11) appellant did not sign a written consent to search.

It is undisputed that appellant was under arrest at the time he gave consent to search. However, the fact that appellant was in custody does not, without more, render his consent to search involuntary. *Juarez v. State*, 758 S.W.2d 772, 775 (Tex.Crim.App.1988), *overruled on other grounds*, 820 S.W.2d 122 (Tex.Crim. App.1989). It is, nevertheless, one of the circumstances to be considered. *Williams v. State*, 937 S.W.2d 23, 28–29 (Tex.App.— Houston [1st Dist.] 1996, pet. ref'd, untimely filed).

Appellant asserts he was arrested at gunpoint by three armed police

895 S.W.2d 399, 400 (Tex.App.—Corpus Christi 1994, no pet.). However, a motion to suppress is merely a specialized pretrial objection. *Galitz v. State*, 617 S.W.2d 949, 952 n. 10 (Tex.Crim.App.1981). The accused retains his right to raise any appropriate objection at trial where he can, at that time, confront and cross-examine the witnesses. *Calloway v. State*, 743 S.W.2d 645, 649 (Tex. Crim.App.1988).

officers who "kept intimidating [him] with their guns" after he was in custody. An environment of few or many officers is significant in determining the validity of a consent to search. *Rosalez v. State*, 875 S.W.2d 705, 721 (Tex.App.—Dallas 1993, pet. ref'd). The Court of Criminal Appeals has been critical of consent given in the face of numbers of armed officers. *Lowery v. State*, 499 S.W.2d 160, 168 (Tex. Crim.App.1973). Moreover, the display of weapons is a coercive factor that sharply reduces the likelihood of freely given consent. *Id.*

The State offered evidence, however, disputing appellant's account of the arrest. Appellant admitted that he tried to escape, and Officer Wood claims that as appellant was charging toward him, he drew his weapon, but never pointed it at appellant. When making a temporary detention, the police are authorized to use such force as is reasonably necessary to effect the goal of the stop: investigation, maintenance of the status quo, or officer safety. *Gordon v. State*, 4 S.W.3d 32, 37 (Tex.App.—El Paso 1999, no pet.). Likewise, when making an arrest, the police may use all reasonable means to effect it and may use force to the degree such force is immediately necessary to make the arrest or prevent an escape. TEX.CODE CRIM. PROC. art. 15.24 (Vernon 1977); TEX. PEN. CODE ANN. § 9.51 (Vernon 1994). Moreover, an officer's display of a firearm does not constitute use of deadly force. TEX. PEN.CODE ANN. § 9.04 (Vernon 1994). We have no doubt appellant was intimidated by the convergence of armed police officers at the time of his arrest—he would not have otherwise surrendered. Thus, the use of three officers to effect appellant's arrest and the display of a weapon by Officer Wood were not unreasonable under the circumstances presented here.

After his arrest, appellant contends the officers intimidated him with their guns.

Appellant does not specify whether he was intimidated: (1) by the mere knowledge that police officers are ordinarily armed; (2) by the visible manifestation of weapons on the officers' persons; or (3) by the overt use or display of weapons for the purpose of intentionally terrifying him, e.g., weapons were pointed or waived in his direction. For its part, the State provides no clarification; its evidence only shows that no police officer "intimidated [appellant] with a gun or guns." Because undercover officers normally carry concealed firearms, it may well be that no weapons were visible after the initial arrest. On the other hand, it is possible the officers prominently displayed their weapons or manipulated them in a manner that would cause a reasonable person to be alarmed. The affidavits submitted by the parties are so lacking in detail we are uncertain how the trial court rationally resolved the dispute. Nevertheless, we must defer to the trial court's inferred findings of fact. Interpreting the affidavits in the light most favorable to the trial court's ruling, we presume that appellant was in no way intimidated by the officer's possession of firearms.

It is also undisputed that appellant remained in handcuffs after he was arrested. Keeping in mind that appellant had previously tried to escape, it is not surprising that the police were reluctant to remove the physical restraints. However, the fact that appellant was handcuffed when he gave consent weighs heavily against the State's assertion that appellant's consent was voluntary. *Reasor v. State*, 12 S.W.3d 813, 818 (Tex.Crim.App.2000). However, one affirmative step taken by the police to reduce the intimidating effect of the confrontation was to advise him of his legal rights.

Appellant also contends his consent was coerced by the fact that he was detained in

a hotel room that had become a base for police operations and surveillance. The police, however, had limited options. Considering the choices available, it seems a hotel room would be a less hostile and far more relaxing venue for deliberation and discussion than a public hallway, stairwell, hotel lobby, or police station. Appellant does not explain in his affidavit, nor can we perceive, why a hotel room would produce an inherently coercive atmosphere.

Appellant claims he gave police consent to search partly because they already had the key to his hotel room. Because police had the means to unlawfully enter appellant's hotel room, appellant argues he was somehow obliged to give them permission to search his room. We disagree. Removal of appellant's room key did not strip him of his ability and legal right to refuse to consent to the search. *Goines v. State*, 888 S.W.2d 574, 578 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd).

In his affidavit, appellant states the officers "ordered me to show where the drugs were." By demanding that he show them where the methamphetamine was hidden, appellant argues he merely yielded to a claim of police authority. The State offered evidence, however, that at "no time was [appellant] ordered by anyone to show where the drugs were." Presuming, as we must, that the trial court resolved this factual dispute in favor of the State, we find appellant was not ordered by police to show them the methamphetamine.

 Appellant asserts in his affidavit that he initially refused to give police consent to search. However, after repeated requests, appellant's will was eventually overborne. "The fact that appellant refused to give his consent ... while a factor to be considered in evaluating the voluntariness of his later decision to give consent, is not determinative." *United*

*States v. Pulvano*, 629 F.2d 1151, 1157 (5th Cir.1980). "One who refuses to cooperate with the police on the grounds that he is constitutionally permitted to do so, may change his mind at some later time and decide to voluntarily cooperate." *Id.* Furthermore, Officer Wood stated in his affidavit:

Affiant asked Manzi again if he had any drugs in the room. Manzi said there had been lots of people visiting him in the room, and he did not know what someone could have left there.

Affiant asked Manzi if he would sign a consent form that would allow officers to search his hotel room for drugs. Manzi said ... "Look, If there is dope in the room, and I help you, and my girlfriend doesn't know anything about the drugs, will you agree not to arrest her?"

While appellant's initial response to Officer Wood's request for consent cannot be characterized as permission, neither can it be correctly described as a refusal. According to the State's evidence, appellant immediately attempted to negotiate an agreement wherein his consent was contingent upon a guarantee that his girlfriend would not be arrested. Far from showing coercion, appellant's response demonstrates an awareness of his legal rights and the constitutional restraints under which the police were forced to proceed.

 Appellant next claims his consent was coerced, in part, by the officers' failure to affirmatively inform him of his right to refuse consent. The affidavits offered by neither party address this issue. However, the State does not dispute appellant's assertion that no such admonition was given.[3] The showing that a suspect has been warned that he does not have to consent to the search and has a right to refuse is of evidentiary value in determining whether a

---

3. Appellant, however, was advised of his right to remain silent.

valid consent was given. *Allridge v. State,* 850 S.W.2d 471, 493 (Tex.Crim.App.1991). Nevertheless, police have no affirmative obligation to warn a suspect that consent may be refused. *De Jesus v. State,* 917 S.W.2d 458, 462 (Tex.App.—Houston [14th Dist.] 1996, pet. ref'd).

Appellant further asserts his consent was coerced by a promise not to arrest his girlfriend. The State strongly disputes appellant's assertion. All three police officers state in their affidavits that no promise·was ever made to appellant that his girlfriend would not be arrested. In light of the trial court's denial of the motion to suppress, we must conclude that the trial court impliedly found no such promise was made to appellant.

 Finally, appellant contends the failure of the police to obtain a written consent to search is some evidence that his consent was involuntary. It is well established, however, that a valid consent to search may be oral. *Montoya v. State,* 744 S.W.2d 15, 25 (Tex.Crim.App.1987), *overruled on other grounds,* 933 S.W.2d 73 (Tex.Crim.App.1996).

In reviewing the totality of the aforementioned circumstances, we also take note of the Court of Criminal Appeals recent decision in *Reasor v. State,* 12 S.W.3d at 814–19. There the police surrounded the defendant outside his home where he was taken into custody at gunpoint and handcuffed. Thereafter, the police performed an illegal "protective sweep" of the defendant's home. Police then unlawfully entered the house with the defendant in handcuffs. After they had already entered the home, the police requested and obtained a written consent to search the house. After reviewing the various factors relating to the voluntariness of the defendant's consent, the Court of Criminal Appeals held the trial court did not err in concluding there was clear and convincing evidence to show such consent

was voluntary. The court noted several factors supporting its decision: (1) the police no longer had their guns drawn when the defendant finally consented; (2) the police gave the defendant his *Miranda* warnings; and (3) the defendant specifically told police where to find the contraband within his home. Here, the trial court impliedly found that: (1) Officer Wood never pointed his weapon at appellant; (2) no officer intimidated appellant with his firearm; (3) Officer Wood gave appellant his *Miranda* warnings as codified in Article 38.22, § 3(a) of the Code of Criminal Procedure; (4) appellant acknowledged to Officer Wood that he understood his rights; (5) the police did not, unlike the situation in *Reasor,* enter the hotel room prior to obtaining consent; (6) appellant exhibited an understanding of his right to refuse consent by attempting to negotiate a deal for his girlfriend; and (7) appellant directed police to the specific locations in his room where methamphetamine was hidden. Thus, here there are many more factors supporting the trial court's conclusion that the consent was voluntary than existed in *Reasor.*

Accordingly, we find the trial court did not err in finding there was clear and convincing evidence that appellant voluntarily consented to the search of his hotel room. Appellant's point of error is overruled, and the judgment of the trial court is affirmed.