**Opinion issued August 9, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-11-00466-CR**

**NO. 01-11-00467-CR**

———————————————————————————————

**MELVIN RAYMOND SCHIELD JR., Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

———————————————————————————————

**On Appeal from the 149th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 60947**

———————————————————————————————

**MEMORANDUM OPINION**

Appellant, Melvin Raymond Schield Jr., was charged by indictment with possession of at least 400 grams of tetrahydrocannabinol and possession of marijuana weighing between 50 and 2,000 pounds. Schield moved to suppress

evidence obtained during the search of his property, arguing that his consent to search was coerced and involuntary. The trial court denied the motion and Schield re-litigated the consent issue at trial. A jury found him guilty of possession of both substances, sentenced him to ten years in prison for each count, but probated his sentence for his possession of marijuana conviction.[1] In his sole issue on appeal, Schield argues the trial court erred in denying his motion to suppress.

We affirm.

## Background

At the hearing on Schield's motion to suppress, law enforcement agents testified that a task force team approached Schield on October 7, 2009, after a third party informed them that Schield had a marijuana grow house on his property. Schield testified at the hearing. He explained that his five-acre property in Brazoria County has three buildings on it: a residence, his wife's business, and a Quonset hut. Schield was in the Quonset hut at approximately 9:00 p.m. when he heard a helicopter and saw a bright light overhead. Schield was unable to reach his wife by phone but did get a call in which an officer asked him to come to the front of the property. Schield testified that he opened the wooden gate separating the Quonset hut from the rest of the property, saw fifteen to twenty cars in his

---

[1]     For the possession of marijuana charge, the jury assessed a $50,000 fine, which was also probated.

driveway, and noticed that the lights in his house were on. Two armed officers stood at the gate.

Schield gave a detailed account of his exchange with the officers. According to Schield, only one of the two officers spoke, and that officer asked Schield if he knew why they were there. Schield said that he did. The officer told Schield that they did not have a search warrant but had a form that they wanted him to sign. Schield said he was given time to read the consent form, but he did not do so because he did not have his glasses and it was dark. Schield did acknowledge, however, that an officer read the form to him. It said:

> TO WHOM IT MAY CONCERN
>
> This is to certify that I, Raymond Schield, the undersigned, after having been duly warned of my rights to refuse, under my Fourth Amendment Rights, which protects me against unreasonable search and seizure, do hereby freely and voluntarily give my permission and consent to an agent of Sheriff Charles S. Wagner of Brazoria County, Angleton, Texas, to conduct a search for any evidence of any crime at the listed addresses and /or locations and /or vehicles as follows:
>
> All property and residence and buildings, fields and out buildings and curtil[age]located at 2334 CR 48 and 2342 CR 48 residence, out buildings, fields, buildings, and curtil[age].
>
> Also, knowing my rights, I voluntarily request the agent of Sheriff Charles S. Wagner to seize any property, item or paperwork that may be evidence of a crime.

Schield admitted that he signed the consent form.

3

At the hearing, Schield testified that although he did not believe the officers could obtain a warrant, he signed the consent form because the officers told him to sign it "or it would be bad for him and his family." Schield explained that, throughout the exchange, no one had told him where his wife was and he felt that he should sign the form or "something bad was going to happen." He explained that he did not feel free to leave because one of the officers had a gun and he felt threatened. Despite these claims, Schield admitted that no one yelled at him during the exchange; on the contrary, when asked what tone the officers used, Schield described it as matter of fact.

After Schield signed the consent form, he showed the officers his marijuana operation. Schield was then read his *Miranda* rights but not arrested. The officers conducted a "bio" interview of Schield in his home before Schield, while handcuffed, directed officers to a second rental house that he used as part of his marijuana operation.

Ryan Mason, Schield's step-son who also testified at the hearing, had spoken to the officers before Schield came to the front of the property. Mason explained that he was in the house when the officers arrived and that, upon seeing officers shine flashlights in his kitchen, he stepped outside to talk to them. According to Mason, the officers asked him to lift his shirt to check for weapons, and he complied. Then the officers asked if they could look in the home. Mason

4

said that twice he told the officers that they could not come into the house, and he also told them that he wanted to wait for his parents to arrive. According to Mason, because the officers had guns and bulletproof vests, Mason did not protest when the officers told him that they were coming into the house even though he did not give permission. Mason sat in the living room while officers searched the house and, in the process of the search, discovered marijuana in Mason's room. Officer J. Brawner of the Drug Enforcement Administration (DEA) testified that Mason orally permitted a protective sweep of the house. According to Deputy C. Henken, he and the other officers entered the house because Mason gave oral permission for them to do so.

Agent S. Greenwell and Officer Brawner both stated that there were numerous police vehicles in Schield's driveway. Although Greenwell admitted that the police cars blocked Schield's driveway, Greenwell also testified that throughout his encounter with Schield, Schield was "cooperative" and "docile." Greenwell stated that Schield did not appear to be afraid and that no one threatened Schield.

At the conclusion of the pre-trial hearing, the trial court granted Mason's motion to suppress but denied Schield's. The trial court found Schield was not intimidated and commented that Schield testified in a way that seemed "artfully crafted" to show coercion.

Schield re-litigated the consent issue at trial. Schield testified at trial, as he had at the pre-trial hearing, that there was an "overwhelming force against him" such that his consent was involuntary. But he also acknowledged before the jury that he was not handcuffed at the time that he consented to the search, and that none of the officers ever pointed a gun at him or yelled at him.

Henken testified that he saw Schield sign the consent form, that Schield and the officers were calm throughout the exchange, and that no one threatened Schield or his family. DEA Agent B. Sowell testified that he asked Schield to come to the front of the house and that he and Greenwell were present when officers explained the consent form to Schield. According to Sowell, the presence of uniformed officers on Schield's property and the helicopter over Schield's property was not out of the ordinary considering the size of Schield's property. Sowell also pointed out that, while the officers were wearing bullet proof vests, they did not carry machine guns or assault rifles, and no one pointed a gun at or otherwise threatened Schield. Greenwell testified that no one threatened Schield's family, no one threatened to get a warrant, and that Schield read the consent form before signing it. The jury also considered Mason's testimony from the hearing on the motion to suppress.

The jury found Schield guilty of both possession charges. He appealed.

6

## Standard of Review

We review a ruling on a motion to suppress for an abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Accordingly, a trial court may choose to believe or to disbelieve all or any part of a witnesses' testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When, as here, the trial court fails to make explicit findings of fact, we imply fact findings that support the trial court's ruling so long as the evidence supports these implied findings. *See Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007). Because issues of consent are necessarily fact intensive, a trial court's finding of voluntariness must be accepted on appeal unless it is clearly erroneous. *Meekins v. State*, 340 S.W.3d 454, 460 (Tex. Crim. App. 2011).

Appellate courts generally limit their review of the trial court's ruling to an examination of the evidence produced at the suppression hearing. *Gutierrez*, 221 S.W.3d at 687. This general rule, however, does not apply when, as here, the

parties re-litigate the suppression issue during the trial on the merits. *Id.*; *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). We therefore consider both the pretrial evidence and the trial testimony in our review of the trial court's ruling. *Id.*

## Voluntariness of Consent to Search

### A. Applicable Law

A voluntary consensual search is an exception to the probable cause and warrant requirements of the Fourth Amendment of the United States Constitution and article I, section 9 of the Texas Constitution. *Guevara v. State*, 97 S.W.3d 579, 582 (Tex. Crim. App. 2003); *Reasor v. State*, 12 S.W.3d 813, 817 (Tex. Crim. App. 2000). "The validity of a consensual search is a question of fact, and the State bears the burden to prove by clear and convincing evidence that consent was obtained voluntarily." *Gutierrez*, 221 S.W.3d at 686. "[C]ourts review the totality of the circumstances of a particular police-citizen interaction from the point of view of the objectively reasonable person, without regard for the subjective thoughts or intents of either the officer or the citizen." *Meekins*, 340 S.W.3d at 459 (citing *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S. Ct. 2778, 2783 (1985)). "The ultimate question is whether the person's 'will ha[s] been overborne and his capacity for self-determination critically impaired,' such that his consent to search

must have been involuntary." *Id.* (quoting *United States v. Watson*, 423 U.S. 411, 424, 96 S. Ct. 820, 828 (1976)).

In this analysis of voluntariness courts may consider numerous factors, including: "physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances." *Id.* at 460 (citing *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir. 1998)). We may also consider appellant's age, education, and intelligence, the length of detention, any constitutional advice given to the defendant, and the repetitiveness of the questioning. *See Reasor*, 12 S.W.3d at 818. Other relevant factors are whether appellant was in custody, or had been arrested at gunpoint; and whether appellant was warned that he had the option to refuse to consent. *Flores v. State*, 172 S.W.3d 742, 749 (Tex. App.—Houston [14th Dist.] 2005, no pet.). In examining the totality of the circumstances surrounding the consent to search, the trial court should consider the circumstances before the search, reaction of the accused to pressure, and any other factor deemed relevant. *Reasor*, 12 S.W.3d at 818.

## B. Analysis

Schield admits that he signed the consent form but argues that his consent was nevertheless involuntary because it was coerced. He relies on the following

9

factors to show that his consent was involuntary: (1) numerous officers arrived at his home wearing "tactical gear" and carrying weapons, blocked his driveway with multiple vehicles, and had a helicopter hover overhead, (2) the officers failed to give *Miranda* warnings before the search, (3) Schield had only a short time to consider whether to consent, (4) Schield's minimal education and age, (5) Schield did not know that he could refuse the search, (6) at the time he consented Schield knew officers were already in his house performing a search that the trial court found to be illegal, (7) officers arrived at his property with the sole purpose of obtaining consent from Schield, and (8) Schield did not volunteer his consent; rather, the officers requested that Schield give them consent to search.

We note at the outset that the fact that Schield gave written consent for the agents to search his home tends to show that his consent was definite and unequivocal. *See Lackey v. State*, 638 S.W.2d 439, 452 (Tex. Crim. App. 1982) (noting that a person will consider decision with more care and deliberation if he gives written as opposed to verbal consent). While Schield contends he could not read the consent form because it was dark and he could not see, Greenwell testified that it appeared to him that Schield read the form. And Schield admitted that one of the offices read the form to him. Although Schield denied knowing that he knew that he had a right to refuse consent, the consent form he signed contradicts his argument.

10

We next note that there was no suggestion from Schield of any violence, mistreatment, deception, or promises. *See Meekins*, 340 S.W.3d at 460 (noting these as factors for courts to consider in determining if consent was voluntary). Rather, Schield seeks reversal based on two claims: that the officers verbally threatened his family, and that the show of force rendered his consent involuntary.

The trial court was presented with conflicting testimony about whether the officers threatened Schield or his family. According to Schield, officers threatened that it would go badly for him and his family and that they would get a warrant if he did not sign the consent form. But multiple officers and agents testified that no one made any such threats. The trial court also heard Schield's testimony that he felt coerced because he knew that officers were inside and searching his home with his family in it. In fact, during the hearing on the motion to suppress, the trial court stated that it believed that Schield knew that lights were on in his home, but it did not believe that Schield knew that officers were inside the home before he consented. Reviewing the conflicting testimony in the light most favorable to the trial court's ruling, we conclude that the trial court properly could have resolved these conflicts in favor of the State. *See Gutierrez*, 221 S.W.3d at 687–88 (in denying motion to suppress trial court implicitly disbelieved appellant's testimony that officers threatened his property and family and believed officer testimony that no threats were made); *see also Cisneros v. State*, 290 S.W.3d 457, 465 (Tex.

11

App.—Houston [14th Dist.] 2009, pet. dism'd) (noting that trial court could have disbelieved appellant's testimony that officers threatened him to gain consent to search and believed officers' testimony that they did not do so).

We next address Schield's contention that the show of force by the officers was coercive and rendered his consent involuntary. It is undisputed that about twenty officers were on Schield's property at the time they sought his consent to the search. The officers agreed that they parked vehicles on Schield's driveway and that a helicopter hovered over his property before, during, and after Schield signed the consent form. "An environment of few or many officers is significant in determining the validity of a consent to search," and the Court of Criminal Appeals "has been critical of consent given in the face of numbers of armed officers." *Manzi v. State*, 56 S.W.3d 710, 717 (Tex. App.—Houston [14th Dist.] 2001, *aff'd*, 88 S.W.3d 240 (Tex. Crim. App. 2002). For example, in *Lowery v. State*, the Court of Criminal Appeals concluded that consent was not voluntarily. *See Lowery v. State*, 499 S.W.2d 160, 168 (Tex. Crim. App. 1973). In that case, twenty officers were at the apartment where the appellant was located. *Id.* at 167. One of the two officers who initially knocked on the apartment door had his pistol drawn and at least five officers were inside of the apartment when consent was given to the officers by a seventeen year-old girl. *Id.* Although officers obtained a verbal consent to search, there was no testimony detailing how the consent was

12

obtained.  *Id.*; *see also Meeks v. State*, 692 S.W.2d 504, 510 (Tex. Crim. App. 1985) (illegal detention of appellant's car in roadblock with flashing lights and fifteen to twenty police officers in immediate area rendered consent involuntary even if warning was given to appellant); *cf Oliver v. State*, No. 05-95-01845-CR, 1998 WL 257855, at *5 (Tex. App.—Dallas May 22, 1998, pet. ref'd) (mem. op., not designated for publication) (six uniformed officers approaching garage of ten people was not coercive).

We find this case distinguishable from *Lowery* and *Meeks,* in part, because Schield signed a written consent form before the search.  Also, unlike in *Meeks*, where the appellant was illegally detained at a roadblock in her vehicle, Schield was behind a tall privacy fence on his property when Greenwell called and asked him to come to the front of the property.  *See Meeks*, 692 S.W.2d at 510.  Schield walked out from behind his gate to meet the officers.  Although this case and *Lowery* both involved a similar number of total officers on the scene, in *Lowery*, one of the officers had a pistol drawn, and at least five officers were inside the apartment before the seventeen year-old gave verbal consent, but here only two officers, with no guns drawn, approached the middle-aged Schield at his gate to ask for consent.  *See Lowery*, 499 S.W.2d at 167.  In addition, unlike in *Lowery*, multiple witnesses testified about the interaction between Schield and the officers during the time before Schield gave consent.  The officers admitted that they were

13

wearing protective gear and carrying guns, but Sowell, Greenwell, and Schield all testified that no weapons were ever pointed at Schield. Schield further testified that none of the officers yelled at him and that he made small talk with the officers before they asked him to sign the consent form. The trial court expressly stated that it did not believe Schield was intimidated.[2]

Having considered the totality of the circumstances in the light most favorable to the trial court's ruling, we are unpersuaded that Schield's will was overborne or his capacity of self-determination critically impaired. We hold that the trial court's determination that Schield voluntarily consented to a search of his property was not clearly erroneous, and we find no abuse of discretion. *See Gutierrez*, 221 S.W.3d at 687 (resolving conflicting testimony in light favorable to trial court's ruling and holding appellant voluntarily cooperated and signed consent form willingly and without taint of duress); *Reasor*, 12 S.W.3d at 819 (appellant's consent to search voluntary even after first illegal search of home, when record showed appellant, after giving consent, received *Miranda* warnings, and

---

[2] At the time of the search Schield was a middle-aged high school graduate who had attended community college and who owned his own air conditioner repair business. We do not find merit in Schield's contention that his age and education should weigh in favor of suppression. *See Cisneros v. State*, 290 S.W.3d 457, 465 (Tex. App.—Houston [14th Dist.] 2009, pet. dism'd) (fact that appellant "was able to communicate efficiently with officers, read the consent form before signing it, and appeared to understand that he was giving the officers consent to search the apartment" weighs in favor of voluntariness).

cooperated in showing police exact location of drugs); *Davalos v. State*, No. 01-11-00069-CR, 2012 WL 1564549, at *5 (Tex. App.—Houston [1st Dist.] May 3, 2012, pet. filed) (mem. op., not designated for publication) (citing *Meekins*, 340 S.W.3d at 459) ("While the late-night arrival of six officers dressed in tactical uniforms might create an intimidating environment, we are unpersuaded the circumstances were sufficient to overbear appellant's will and critically impair 'his capacity for self-determination.'"); *see also Quintanilla v. State*, No. 01-02-00394-CR, 2003 WL 21197167, at *3 (Tex. App.—Houston [1st Dist.] May 22, 2003, pet. ref'd) (mem. op., not designated for publication) (no abuse of discretion where trial court disbelieved appellant's testimony regarding threats and found consent voluntary where appellant signed written consent form ten to fifteen minutes after officers presented it to him even though officers were already inside home performing protective sweep).

We overrule Schield's sole issue.

## Conclusion

We affirm the trial court's judgment.

Rebeca Huddle
Justice

Panel consists of Justices Higley, Massengale, and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).

15