**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00087-CR**

_____

**KEONDRICK ARABIAN ALI BARLOW, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 163rd District Court**
**Orange County, Texas**
**Trial Cause No. B190539-R**

**MEMORANDUM OPINION**

A jury convicted Appellant Keondrick Arabian Ali Barlow ("Barlow") of the

murder of Lamont Williams ("Williams"), a first-degree felony. *See* Tex. Penal Code

Ann. § 19.02. The jury assessed punishment at eighty years of confinement plus a

$10,000.00 fine, and the trial court sentenced him accordingly. The trial court's

judgment also required Barlow to pay attorney's fees, despite his being indigent. In

two issues, Barlow complains: (1) the trial court abused its discretion by admitting

an oral statement of his custodial interview in violation of article 38.22 section

3(a)(2), because the statement was not voluntary; and (2) the trial court abused its discretion by assessing attorney's fees to an indigent offender. *See* Tex. Code Crim. Proc. Ann. art. 38.22 § 3(a)(2). The State concedes Barlow's second issue. For the following reasons, we affirm the trial court's judgment as modified.

## BACKGROUND[1]

**Facts**

On the morning of December 22, 2018, Williams's mother found him deceased in his apartment after Williams's girlfriend notified her that she could not reach him. Williams had been shot three times, with a fatal gunshot wound to the head. Williams's car was also found abandoned nearby. The investigation revealed he was last heard from on December 21, 2018, but forensic pathologists could not determine a time of death.

In Williams's home, investigators and crime scene technicians found two condoms removed from the wrappers, an apparent blood stain on the wall, an IBC Cream Soda bottle near Williams, digital scales, a marijuana cigarette, marijuana residue, and small plastic baggies. A television was pulled from the wall, and Williams's surveillance cameras were missing. Williams, a drug dealer, was known to keep cash in his home, but investigators did not locate any cash at the scene.

---

[1]We limit our background discussion to those facts necessary to resolve the appeal. *See* Tex. R. App. P. 47.1 (requiring appellate court to hand down an opinion as brief as practicable that addresses all issues necessary to the appeal's resolution).

2

On December 22, 2018, Barlow called the Orange Police Department and told Detective Jason Laughlin ("Laughlin") he wanted to clear his name. So, two other detectives picked him up, and he voluntarily came to the police station. Barlow provided a signed written statement that he was at Williams's house on December 21, but he left around 9:30 p.m. Barlow stated that when he left, four other men were there, and "two white girls" were on the porch when he left. Barlow said that when he left Williams's house, he went to work in Louisiana and did not return until six the next morning.

On December 23, 2018, Barlow repeatedly called the Orange Police Department and provided the name of a "white woman" who may be responsible. That afternoon, Barlow came to the police station unannounced and told Laughlin that Jasmine Jackson ("Jackson") picked him up from Williams's house then brought him to his grandmother's. After that, he said JoCoby Vontoure ("Vontoure") gave him a ride to work between 9:30 and 9:45 p.m. During this interview, Barlow told Laughlin he had never driven Williams's vehicle.

On December 28, 2018, Barlow voluntarily spoke to police again and provided a timeline of events to Detectives Henry and Steele. At this point, investigators noticed more inconsistencies with Barlow's original statement, including who was there when he left. That day, Barlow consented to the investigators' searching his cell phone and later, he voluntarily provided a DNA

3

sample. Barlow initially told investigators that he had been at Williams's house on December 21, 2018, and that several people came to Williams's home to purchase drugs. Barlow also told investigators he left Williams's apartment at 9:20 or 9:30 p.m. when his girlfriend, Jasmine Jackson,[2] picked him up and took him home. Then, at 9:45 p.m., Vontoure picked him up to go to work in Vinton where he stayed for a few hours, after which Vontoure brought him home. Barlow also denied ever driving Williams's car.

Other witnesses contradicted Barlow's version of events and timeline. Jackson told investigators that Barlow instructed her to tell the police she had given him a ride on December 21, 2018, which she denied, because she lost her car keys. Likewise, Vontoure, who had an ankle monitor, did not take Barlow to Louisiana, because Vontoure's son was in the hospital. The data from Vontoure's ankle monitor verified this. Barlow's manager at the concrete plant testified that Barlow last worked on December 20, 2018. The manager denied that Barlow worked on December 21, 2018, and because Barlow failed to show up for work at all that day, they fired him. GPS data from the woman's phone that Barlow said may be responsible showed that she was not near Williams's house during the murder.

When investigators downloaded Barlow's phone data, text messages showed that he wanted to buy a car a week before the murder, but on December 21, 2018, he

---

[2]The record shows that Jasmine Jackson also went by the name Jasmine Riggs.

did not have enough money. The day after Williams's murder, Barlow had the money to buy the car.

**Custodial Statements**

On January 2, 2019, and April 16, 2019, while Barlow was in custody for unrelated charges, investigators interviewed him about the murder twice. These statements were video recorded, and the State redacted the videos and agreed to play only the audio to avoid any prejudicial effect on the jury or seeing Barlow in handcuffs and to avoid mentioning extraneous offenses. Barlow objected to the voluntariness of both statements under article 38.22. The trial court conducted a hearing outside the jury's presence. During the hearing, Laughlin testified that he met with Barlow on January 2, 2019, when he arrested him for an unrelated theft charge. After arresting him, Laughlin read Barlow his rights, which Barlow voluntarily waived, and then Barlow continued discussing this case. Laughlin testified the recording accurately depicts what occurred, and the only alterations were redactions to avoid the prejudicial effect. The video recording of the January 2, 2019, interview was played for the trial court and shows Laughlin reading Barlow his rights and Barlow signing a waiver. Laughlin testified the people in the room speaking during the interview were Detective Ward, Barlow, and himself.

Laughlin testified that on April 16, 2019, they interviewed Barlow again while he was in custody. Laughlin likewise testified that he read Barlow his rights, and

Barlow waived them, which the video recording played for the trial court shows. Barlow then spoke with detectives. Laughlin authenticated the original video then testified the only alterations in the audio version removed prejudicial information. He identified the speakers on the video as Detective Ward, Barlow, and himself.

At the end of the hearing, the trial court found the statements were voluntary and admitted them but noted only the redacted portions would be played for the jury. The trial court also signed a written order finding the statements voluntary under article 38.22, section 2(a).

After the trial court admitted both audio recordings, the State played them for the jury. In the first recording, on January 2, 2019, investigators confronted Barlow about inconsistencies between the evidence and his prior statements. Among other things, during the interview, Barlow denied he was around Williams's house, despite previously telling investigators he was there. In the second recording, on April 16, 2019, investigators again confronted Barlow about his lies, including the DNA evidence, but Laughlin testified he doubled down. During the interview, Barlow admitted he was "supposed to get rid of Josh [Rhodes]" and said he "made an honest mistake."

**Additional Evidence and Jury's Verdict**

Laughlin testified that Josh Rhodes also came up as a suspect during the investigation. They questioned Josh Rhodes, but Laughlin was unaware if anyone

6

took a DNA swab from him. They also did not download his phone or search his house. Laughlin testified they were able to confirm other suspects' alibis. Barlow did not have an alibi and continually lied to investigators. The evidence established that Barlow's DNA profile matched DNA found on the following evidence: a blood stain on the wall in Williams's living room; the IBC bottle near Williams; a condom; the interior driver's side door panel of Williams's car; and the front driver's side seat of Williams's car.

The jury found Barlow guilty of murder and assessed punishment at eighty years of confinement plus a $10,000.00 fine. The trial court pronounced Barlow's sentence consistent with the jury's verdict, but the judgment reflects that the trial court assessed attorney's fees of $19,914.00, listed as "Reimbursement Fees."

## ISSUE ONE: ARTICLE 38.22 § 3(a)(2), VOLUNTARINESS OF CUSTODIAL STATEMENT

In issue one, Barlow complains the trial court abused its discretion by admitting Barlow's recorded custodial statements as they were involuntary and violated Texas Code of Criminal Procedure article 38.22, section 3(a)(2). Specifically, Barlow asserts that the number of officers present and the fact that he was in jail made his statements involuntary. The State responds that it complied with the applicable statutory requirements, and the trial court properly admitted the recorded custodial statements.

**Standard of Review and Applicable Law**

Generally, we review a trial court's ruling on a motion to suppress custodial statements under a bifurcated standard. *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018). We give almost total deference to a trial court's factual findings supported by the record especially if they depend on an evaluation of credibility and demeanor. *See State v. Lujan*, 634 S.W.3d 862, 865 (Tex. Crim. App. 2021) (quoting *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997)). Likewise, we afford almost total deference to the trial court's determinations of mixed questions of law and fact that depend on credibility and demeanor. *See id.* at 865–66. When a trial court's application of law to the facts does not depend on credibility and demeanor, we conduct a de novo review. *See Cole v. State*, 490 S.W.3d 918, 922 (Tex. Crim. App. 2016). In ruling on a motion to suppress, the trial court is the exclusive trier of fact and judge of the witnesses' credibility. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *Garza v. State*, 213 S.W.3d 338, 346 (Tex. Crim. App. 2007). A trial court may choose to believe or disbelieve any part of a witness's testimony. *Valtierra*, 310 S.W.3d at 447. We must uphold the trial court's ruling on a motion to suppress, if the "ruling is 'reasonably supported by the record and is correct under any theory of law applicable to the case.'" *Id.* at 447–48 (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)); *see also Lujan*, 634 S.W.3d at 866. "Determining whether the requirements of Article

38.22 were met is an application-of-law-to-fact question that commands a view of the evidence that is most favorable to the trial court's ruling." *Lujan*, 634 S.W.3d at 866 (citation omitted).

Article 38.22, section 3(a)(2) states that "prior to the statement during the recording the accused is given the warning in subsection (a) of Section 2 . . . and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning." Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a)(2). Article 38.22, section 2 provides that for a statement to be admissible as evidence:

> (a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this code or received from the person to whom the statement is made a warning that:
>> (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
>> (2) any statement he makes may be used as evidence against him in court;
>> (3) he has the right to have a lawyer present to advise him prior to and during any questioning;
>> (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
>> (5) he has the right to terminate the interview at any time; and
> (b) the accused, prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived the rights set out in the warning prescribed by Subsection (a) of this section.

*Id.* art. 38.22, § 2(a), (b). If a question is raised as to the statement's voluntariness, the trial court must conduct a hearing outside the jury's presence and make an independent finding the statement was voluntary. *See id.* art. 38.22, § 6. Then, the

9

trial "court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with specific findings of fact upon which the conclusion was based, which order shall be filed among the papers of the cause." *Id.*

"Coercive government misconduct renders a confession involuntary if the defendant's 'will has been overborne and his capacity for self-determination critically impaired.'" *Davis v. State*, 313 S.W.3d 317, 337 (Tex. Crim. App. 2010) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973)). Whether a defendant's will has been overborne is assessed considering the totality of the circumstances, including the accused's characteristics and details of the interrogation. *See id.* (citation omitted); *see also Craeger v. State*, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997) ("Voluntariness is decided by considering the totality of the circumstances under which the statement was obtained."). Additionally, "[t]he mere fact that an individual is in custody" does not render the statement involuntary. *Sugars v. State*, No. 07-03-0029-CR, 2004 WL 609318, at *5 (Tex. App.—Amarillo Mar. 29, 2004, pet. ref'd) (mem. op., not designated for publication) (citing *Alonzo v. State*, 591 S.W.2d 842, 847 (Tex. Crim. App. 1979)); *see also Reyes v. State*, 741 S.W.2d 414, 430 (Tex. Crim. App. 1987) (citations omitted) (discussing voluntariness in the context of consent to search and explaining that custody alone does not render consent involuntary but is a factor to consider).

**Analysis**

When Barlow objected to the statements' voluntariness, the trial court conducted a hearing outside the jury's presence. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 6. The trial court determined the statements were voluntary and signed an order explaining that: the statements were electronically recorded; all voices were identified; the defendant received copies not later than the 20th day before trial; and before each interrogation, Barlow was advised of his constitutional rights as required under 38.22, § 2(a) and that he appeared in the video recording "to understand and voluntarily waive those constitutional rights."

During the January 2, 2019, interrogation, Barlow was initially belligerent, did not want to talk to detectives, and demanded to know what he was under arrest for. Detectives Ward and Laughlin explained he was under arrest for a separate theft charge, then Barlow told detectives he wanted to talk. Detective Laughlin read him his rights, Barlow said he understood, then signed a waiver. The officers pointed out discrepancies in his story, but they were not forceful or misleading and remained seated for most of the interview. Neither detective displayed a weapon at any time during the interrogation.

The video recording of Barlow's second custodial interrogation on April 26, 2019, shows detectives Ward and Laughlin with Barlow. Ward leaves at Barlow's request, because Barlow said he wanted to talk to Laughlin alone. Detective

11

Laughlin explained that he could not talk to Barlow without reading him his rights. Barlow complained about Laughlin's reading his rights, but Laughlin insisted on reading them, after which Barlow said he understood and wanted to talk. A few minutes later, the video shows Barlow signing a card acknowledging that he was read his rights. Laughlin noted the inconsistencies between Barlow's story and the evidence. He did not pressure Barlow and told him he would be willing to talk to his attorney after "he brought the case." The recording shows that Barlow became emotional and refused to get out of his chair as the two detectives prepared to return him to the jail. Barlow told them he "might as well get tazed and pepper sprayed." Despite this, the detectives remained calm. The only time additional officers were present was after the second interrogation ended and Barlow refused multiple requests to leave the interrogation room; officers came and stood by in the hallway waiting to assist with his removal if needed. Barlow eventually agreed to leave, so the officers in the hall did not have to intervene. Even in the face of Barlow's obstinance, neither detective displayed a weapon.

Barlow cites to *Manzi v. State*, for the proposition that the Court of Criminal Appeals is "critical of consent given in the face of numbers of armed officers." 56 S.W.3d 710, 717 (Tex. App.—Houston [14th] Dist. 2001), *aff'd*, 88 S.W.3d 240 (Tex. Crim. App. 2002). *Manzi* involved consent to search a hotel room after a suspect fled and was "arrested at gunpoint by three armed officers." *Id*. Our sister

12

court noted that the display of weapons could be a coercive factor in the context of consent to search. *See id.* Here, we are faced with a custodial statement rather than a consent to search, and the record before us establishes that officers did not display their weapons. Even so, in *Manzi*, the Houston Court of Appeals ultimately determined that the trial court did not err by finding the appellant voluntarily consented to the search of his hotel room. *See id.* at 719.

Contrary to Barlow's assertion that three officers were in the interrogation room, the video recordings show that during the interrogations, only two officers were present. Additionally, for most of the second interrogation and at Barlow's request, only one officer was in the room. Although Barlow repeatedly said he knew his rights, Detective Laughlin insisted on reading the statutory warnings and obtaining an express waiver from Barlow of his rights before he questioned him. *See Davis*, 313 S.W.3d at 337 (citation omitted) (finding no police misconduct and noting the detective "was especially diligent in reading the warnings in their entirety, in making sure that appellant understood them, and in obtaining an express waiver"). Barlow complains that the number of officers and the fact that he was in custody rendered his statements involuntary, yet the record supports the trial court's conclusion that officers read Barlow his rights, he voluntarily waived them, and the statements were voluntary. *See Lujan*, 634 S.W.3d at 865–66. Examining the totality

13

of the circumstances in the light most favorable to the trial court's ruling, the record does not show that Barlow's will was overborne. *See id.* We overrule issue one.

## ISSUE TWO: INDIGENCE AND ATTORNEY'S FEES

In his second issue, Barlow complains that the trial court erred by requiring him to pay attorney's fees since he is indigent. The State concedes this issue.

### Applicable Law

Absent a change in a defendant's indigent status, a trial court cannot impose an award of attorney's fees in the judgment against a defendant who remains indigent when the judgment is pronounced. *See* Tex. Code Crim. Proc. Ann. arts. 26.04(p) (stating an indigent defendant is presumed to remain indigent unless there is a material change in his financial circumstances), 26.05(g); *Wiley v. State*, 410 S.W.3d 313, 317 (Tex. Crim. App. 2013); *Roberts v. State*, 327 S.W.3d 880, 883–84 (Tex. App.—Beaumont 2010, no pet.). Article 26.05(g) requires that a judge order a defendant to pay a reimbursement fee to offset legal services provided to the defendant "[i]f the judge determines that [the] defendant has financial resources" to do so. *See* Tex. Code Crim. Proc. Ann. art. 26.05(g).

### Analysis

The trial court appointed counsel to represent Barlow, and nothing in the record establishes that the trial court found a material change in Barlow's financial circumstances. *See Wiley*, 410 S.W.3d at 317; *Roberts*, 327 S.W.3d at 883–84. Thus,

the trial court erred by assessing reimbursement for court-appointed attorney's fees. *See* Tex. Code Crim. Proc. Ann. arts. 26.04(p), 26.05(g); *Roberts*, 327 S.W.3d at 884 (concluding trial court abused its discretion by taxing indigent defendant with attorney's fees). We sustain Barlow's second issue.

## CONCLUSION

We have overruled Barlow's first issue, but since the trial court erred by assessing attorney's fees against him given his indigent status, we modify the judgment to delete the attorney's fees of $19,914.00 reflected as "Reimbursement Fees." *See* Tex. R. App. P. 43.2(b) (allowing appellate courts to modify a judgment). We affirm the judgment in all other respects.

AFFIRMED AS MODIFIED.

W. SCOTT GOLEMON
Chief Justice

Submitted on June 26, 2024
Opinion Delivered March 19, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.